Mr. Srinivasan. Thank you, Mr. Chief Justice, and may it please the Court. Congress's comprehensive program to address the worldwide problem of HIV and AIDS includes a policy of opposing prostitution and sex trafficking because they contribute to the disease's spread. And correspondingly, Congress determined that the government should partner with the  and AIDS. competitive Federal funding to those organizations that agree with the policy opposing prostitution and sex trafficking, because organizations that agree with that policy are most likely to carry out the Federal program in conformity with the Federal policy priorities. Now, no organization that carries out HIV programming is required to subscribe to the Federal Government's views. But if an organization wants to partner with the Federal Government and get Federal funds to carry out the Federal program, well, that organization The problem is that there are a number of different ways you could carry out the program. And let's say you have an organization that focuses on a particular you know, the administration of hospitals or whatever it is that's covered by the program, and they regard this issue as collateral to what they're concerned with. There have to be some limitations on what type of loyalty oath you can require them to sign, isn't there? Well, I think, Mr. Chief Justice, the way that Congress looked at this was to look at the organizations with which the government is going to partner across the mind run of situations. And I think what one can do is look at Respondent's brief, because Respondent's encompass a variety of different types of organizations. But Respondent's brief itself tells you at pages 11 to 12 and at pages 32 and 33 that there are going to be situations in their own experience in which these issues about prostitution and sex trafficking come into issue. Roberts. I appreciate it. What if they're not? What if the government has, in addition to this policy, a strong policy in promoting, you know, recycling? And so they require everybody with whom they're going to do business, every grantee, to adopt a policy in favor of using renewable resources. Any problem with that? Mr. Chief Justice, I think that would present a different question. Of course, you know that it presents a different question, but it would be more difficult for the following reason. That there is a germaneness component to Congress's, the constitutionality of Congress's funding decisions in this area. And the more sweeping and the less germane the condition would be, the more it's open to constitutional attack. Now, this condition is very, very germane, because as Congress found, prostitution and sex traffic can contribute to the spread of the disease. And so it makes good sense that Congress would have imposed this condition. And I think it's important to understand that. Breyer, on that particular point, what should we do, as far as I can tell from the briefs? The people who work with the prostitutes to try to prevent aid. Uniformly tell us that if you go to those prostitutes and you try to get them to take steps to stop AIDS, it's very hard to do if at the same time you've announced you're against all prostitution. So what they're saying is that the condition imposed will interfere with the objective. And if there is a germaneness requirement, and nobody says the opposite. I mean, I've noted nobody denies what they're saying in terms of the effectiveness of their work. So I don't think, at least I didn't read them all with great care. Maybe you can point to somebody who does. But if everyone is telling us that this is counterproductive, and the exact opposite of the other, then can we say, well, it isn't germane? Well, Justice Breyer, I don't think so in two responses on that floor. First of all, everybody is not telling you that, and I'll tell you who's not telling you that in a second. But the overarching point is that this is a policy determination that Congress, of course, took into account when it fashioned the statute. And it concluded that it was important to have an opposition to prostitution and sex trafficking. Now, as far as the organizations that aren't telling you that, there's an amicus brief that's filed by 46 organizations that it's in our support. Breyer, that's quite a few, yes, that's true. That's in our support. And the lead organization is the Coalition Against Trafficking in Women. And they support us. And they think that the best way, and they argue this passionately in their brief, they think that the best way to provide services to the target audience is under a rubric of opposition to prostitution and sex trafficking. And I would urge you to take a look at that brief, because it explains why the program should be conducted in this fashion. Now, is there a debate about that? Ginsburg, there isn't, at least, I'm not familiar with anything quite like this, where you're not told if you want to run a government program, you have to speak the government's speech. This doesn't require the recipient to speak to anybody at all, except to the government itself to say, I pledge that my policy is the government's policy. So it's making somebody adopt as her own the government's policy, rather than saying, I understand that I get my government money, I have to follow the government's policy about what I can say to the public. Here, is there anything else quite like this, where you make a pledge to the government, but with respect to third parties, it doesn't apply? Justice Ginsburg, if I could just fight the premise of your question just very slightly and then explain why I think this kind of requirement makes sense in this particular context. The goal of this is not to persuade somebody to change their view. The goal of this is to partner with organizations that self-identify as organizations that agree with the government's policy priorities. And the reason the government has done that, and the reason why Congress could have thought that was a good idea, is straightforward. And that is that those organizations that agree with Congress's policy priorities are going to be more likely to be reliable and effective partners in carrying out the government's program. And one way to think about it is to envision this. You have a circumstance in which you're down to your last few dollars of discretionary Federal funding, and you're looking at two different organizations that are competing for that money. One of them comes to you and says, we agree with your policy in opposition to prostitution and sex trafficking. And the other one says, we're not going to tell you whether we agree. We're going to remain studiously neutral. But we'll tell you that we'll conduct our affairs in a manner that's not inconsistent with your policy priorities. I think it makes all the sense in the world for Congress to decide that the government should preferably partner with the former organization rather than the latter, because they're going to be more reliable and more effective at carrying out the government's program. And there's another aspect of this that I think is important to highlight, and that is that we're not just talking about circumstances in which the conduct is arguably going to be neutral, so that there's going to be no position taken. There's also going to be occasions in which the organizations that are providing services are going to have the opportunity to affirmatively embrace the government's policy in opposition to prostitution and sex trafficking. Alito I'm not aware of any case in which this Court has held that it is permissible for Congress to condition Federal funding on the recipient's expression of agreement with ideas with which the recipient disagrees. I'm not aware of any case in which that kind of compelled speech has been permitted. And I would be interested in, and it seems to me like quite a dangerous proposition, I would be interested in whatever limitations you think there might be on that rule, which seems to be the general rule that you're advocating. Other than the requirement of germaneness, is there anything else? There is germaneness, Justice Alito, and I can point to a couple of other limiting principles that have been noted in this Court's decisions and I think that are satisfied here. One is that Finley talked about, and I think it captures some other decisions in this respect, disallowing the government from leveraging its control over funding conditions in a manner that services a speech-suppressive objective. And so you have to be careful, and I think this maps out. Scalia I'll say it again, I didn't understand the point. The government is limited from leveraging its control over funding conditions so that it can achieve a speech-suppressive objective. And I think what the Court was getting at is that you want to be careful that the speech condition, the speech-related condition is tightly tethered to the programmatic objective and not allow the government to have the program seep into other areas where it doesn't have to go. Alito, let me give you this example, which is mentioned in one of the amicus briefs. The government provides lots of funding to universities to, in various forms, either directly or through student loans, in the form of tax exemptions. So anything that would be germane to the general purpose of higher education presumably could be attached as a condition to those funds. Would that be correct? With certain limitations. I mean, I think germaneness is a criterion. With what limitations? So the government could have a whole list of things, of principles that it thinks should be incorporated into higher education, and it could require a university as a condition of receiving this money, let's say directly through student loans, to express agreement with all of these propositions. Would that be true? Well, I'm not sure, Justice Alito. And of course, it's going to be hard for me to decide that we're not going to defend something. But let me just give you a limiting idea that's out there, which is that I think there's an important distinction between circumstances in which the government is partnering with an organization to carry out a government program and circumstances in which the government is extending a Federal subsidy to an individual organization as kind of an across-the-board entitlement. So in the generally applicable across-the-board entitlement. Scalia, what do you mean by partnering? How does this partnering differ from just giving them the money to do the job? Well, I don't know that it differs from giving the money to do the job. I guess what I'm saying is there are going to be circumstances, for example, like in Spicer, where the financial question doesn't have to do with the expenditure of the money by the recipient in a manner that's commensurate with congressional goals. In that context, you're giving a generally applicable entitlement, and you're not so worried about how the money is being spent, because that person is not partnering with the government in carrying out a Federal program. Here, the organizations are partnering with the government in carrying out the Federal program, because it's the Federal HIV program that's going to be used. I don't know what you mean. What do you mean by partnering? You're just saying they are given money to carry out a particular program. Yes. Is that all you mean by partnering? They're given money to carry out a particular program. But in concert with Federal policy priorities. So it's not just a naked grant of money. If you had an entitlement, Justice Scalia, for example, let's just consider your classic entitlement. I understand. It is a naked grant of money to implement a particular program. To implement a particular program. And you call that partnering with the Federal government. I do. Terrible verb, anyway. Okay. My apologies for that, for associating with the organization recipient in carrying out a Federal program. Mr. Cervantes, on this, what does seem to me unusual, as Justice Alito brought out, requiring somebody to say, I believe this, or I agree with the government on that, the Rusby-Sullivan, which is one of the precedents on which you rely, made it a point that the doctor was not required to represent as his own views, not required to represent an opinion that he doesn't hold. He has to adhere to the government's program in his dealings with the public. But he doesn't have to say, I agree with the government. Yes, that's true, Justice Ginsburg, but here's why. And was that just an irrelevant consideration in Rust, that no one was being obliged to say, I believe something that they don't believe? Here's why I think it makes sense in this context. It is distinct in that respect, but here's why I think it makes sense in this specific context. What Congress wanted to do is secure an ex ante commitment from the organizations with which the government works to assure that they agree with the government's policy priorities. Now, where these programs are carried out is in the main, in foreign territory, in distant lands. And in that context, I think Congress would have understood that monitoring of conduct can be particularly challenging. And that monitoring is made all the more challenging because these issues can come into play through a myriad of interactions between the organizations that are working with the government and the local communities and local officials. Breyer, I see that, and I see you have two sides to the policy question. And then it seems to me that the case that Justice Ginsburg was speaking of is pretty relevant. Why? Well, that case, Regan and League of Women Voters, all seem quite comparable. They are trying to balance the desire of the government to further a policy objective with the undesirability of the government invading what would otherwise be a constitutional protected right to speech. And the way they have done it is quite technical and narrow, but it may be applicable. In both, what they said was, don't worry about your protected speech as much as you are because there is another way you can do it here. You go through an independent, structured organization. And where that wasn't present, namely the League of Women Voters, the Court struck it down. Now, if that's the right framework, then here I don't see how you can have an independently structured organization for the reason that a group that said, I am opposed completely to prostitution publicly to get the money, and then set up a structure that said the opposite, would be seen as totally hypocritical, they wouldn't be able to get their message across, they wouldn't be able to express in any way what it is they think about the administration of AIDS in the context, anti-AIDS in the context of prostitution. That's a long question, but you see where I've ended up for the moment, for purposes of the question. So why isn't this case more like League of Women Voters and less like the other two? For the following reasons, Justice Breyer. There is an alternative affiliated organizational vehicle in this case as well, and I think that's constitutionally significant. Now, I'm not going to quibble with Your Honor's point about how the organization that's the funding recipient has made this policy agreement and that that can have ripple effects, but here's why that matters. The point of having an alternate vehicle is not that it remedies a constitutional problem that already exists. The point of it is to get to this leveraging purpose that I was talking about earlier, and it's to show that what the government is doing is keeping the condition within its appropriate confines, and it's not allowing that condition to spread beyond that into other realms. And that purpose is fully served by the organizational affiliate alternative  And I think it's important. Ginsburg. But, Mr. Srinivasan, there is a difference in this international setting. You know, most of those separate affiliates, so it was in taxation, without representation, and it was the cure for the League of Women Voters, but here, as the D.C. district court said, in its opinion, which was in your favor, oh, all you have to do is spin off a subsidiary that gets the government money. It's just a simple matter of corporate reorganization, but you know that getting an NGO, a new NGO recognized in dozens of foreign countries is no simple thing to accomplish. I mean, to take a concrete example, look what happened about a year and a half ago in Egypt when the U.S. NGOs were indicted for criminal, for not complying with the permit requirements of the country. So it's one thing to set up a 501c3 and a 501c4 operating in the United States. Each does its thing. But to require an NGO to then, in the countries where it's operating, get the necessary permits is quite an arduous thing. Well, Justice Ginsburg, I guess it depends on which direction it runs as a principal point. I mean, of course, the recipient organization that's been conducting the program to date can continue to conduct the program, and the affiliate that's set up could be the alternate channel. And so it could run in the opposite direction. I think you wouldn't run into that problem. But I would like to address on this score an important point, which is that I think Respondents have suggested that there's a material distinction between Justice Breyer, the circumstances in Rust, and the circumstances in this case, because Rust involves separate programs within a legal entity, and this case involves separate organizations. And I think the point that Respondents are trying to make is that there's a distinction, because at least there, one legal entity could have multiple programs, some of which are subject to the condition and some of which are not. Whereas here, there's a difference because this condition applies to an entire organization. But I think that's a false premise with respect to Justice Breyer. Breyer. I wasn't accepting that one. Okay. I was ex—I mean, the main difference, it seemed to me, is, assuming all that away, is that here the separate structure does not fulfill the constitutional need simply because the basic condition has to do with express speech, because when A says, I believe in X, and then they set up a separate structure, and everyone knows they've set it up, I mean, that's the point of it, and the structure says, just kidding, nobody believes them from day one, and so you can't do it, and if the government has its way and has awarded the thing properly according to your criteria, the part that won't be believed is the just kidding part. And so this structure, separate structure, just doesn't work in terms of communicating their belief. And I don't think that's true in Rust, and I don't think it's true in Regan, and I do think it's true in FCC v. League of Women Voters. I guess I'd make two points, Justice Breyer. One is, as I was suggesting earlier, the purpose of having this alternate channel is not to remedy a constitutional violation that otherwise would exist. I mean, of course, we start from the premise that it's okay to require this condition at the front end. It's not that it's unconstitutional and the way to compensate for that is to create this affiliate alternative. We think the condition is okay ab initio. What the alternate vehicle does is to address this other problem, that it shows that the condition is appropriately tailored. It's not reaching beyond its appropriate confines because it's allowing for separate organizations. And if the alternative is not really part of the constitutional analysis, then the government could say, why not? It's easy to find policy reasons and really find very, very decent and thoughtful people who agree with the policy reason. You know, there are people on both sides of these questions. And they come in and they say, okay, we're giving money for an anti-abortion purpose or a pro-abortion purpose. You know, and suddenly people can't say anything in these areas in face of such a condition. Well, as part of the constitutional analysis, I guess it's just addressing a different part of the constitutional analysis than what Your Honor is addressing. I guess the other points I'd make are twofold. One is that I think there is something to the notion that if the organizations are sufficiently separate, as they have to be to comply with the regulations, then it does work that one organization can say that we have a particular policy and another organization can say that we have a different policy, precisely because of the premise that they're sufficiently distinct. So I'm not seeing the same degree of cognitive dissonance you are. And the other point I'd make is this, that the speech-related objections that Respondents levy are twofold. One is they complain about the threshold condition. But the second is, and this is made manifest at pages 11 to 12 and 32 and 33 of the brief, is that they want to engage in activities that involve affirmative speech. They want to be able to participate in a dialogue about prostitution and sex trafficking and whether they should be legalized. And with respect to that aspect of what Respondents are complaining about, I think the alternate affiliated organization opportunity is a perfect remedy, in the same way that it was in Rust and in the same way that it was in Regan. Sotomayor, The problem that I have with that answer is that it doesn't cure the organization's need to stay true to its own beliefs. Because if, and I think this is what Justice Breyer was trying to get to, if it's truly an independent organization speaking, then that's that organization's belief. It's not an alternative under Rust to the needs of that organization to have its own personal views. And so I have that problem, which is how is it an alternative for that organization to be able to have its views? Let me give a positive hypothetical that I'm actually very troubled by. Let's assume a city government is undertaking a campaign to prevent teen pregnancy and its associated problems, and it wants to promote the use of contraceptives that protect from contracting, you know, diseases, things like that. And some of its programs involve the distribution of contraceptives, but others involve parenting classes for teenage mothers and offering them free daycare. And a church seeks funds for the daycare part and the parenting part. Can the city now say, because we have this really important need to avoid sexually transmitted diseases, anyone who seeks our funds also have to say they believe in the use of contraceptives? Church there would say, we don't believe, and why should we say we believe? I certainly understand why a church would be reluctant to do that. I mean, I guess, you know, one way to look at it is that the city, I think, would have to think very long and hard about whether that's a desirable policy objective, precisely because some of the organizations with which it wants to work are going to have difficulty abiding by it. And so there's going to have to be a front-end determination as a matter of policy about whether that's an appropriate thing to pursue. But if the city, as Congress did in this case, thought that it was an appropriate thing to do, then I think I would defend that, apart from, you know, free exercise issues or other things that aren't in play here. I think I would defend it, as long as it's sufficiently germane and as long as it's in furtherance of the policy objectives that Congress or by, in your hypothetical, the city wants to carry out. Alito, but let me give you another example that's along the same lines. The Federal Government provides lots of funds to entities and individuals who are involved in the provision of health care. So let's suppose Congress says that we think that the issue of guns is very germane to public health, and therefore, we will not allow anybody to receive any of these funds directly or indirectly unless that entity or person proclaims agreement with whatever we happen to think at the moment about guns. So they must either say, we believe that guns should be strictly limited, access to them should be strictly limited for public health purposes, or that guns should be freely available because we think that promotes public health. That would be permissible, wouldn't it? I don't know that it would, Justice Alito. Why would it not? Because I think, first of all, it would depend on whether there is the requisite germaneness. It would depend on whether, in fact, the organizations are working with — I'm trying to avoid using the word partnering with, but are working with — the government in carrying out the program. It would depend on those kinds of considerations. And whether — another point to be made here is that a limitation that's been recognized in this Court's cases is that, at the end of the day, the government can't be seeking to suppress speech or to suppress disfavored viewpoints, even in the context of subsidization. And you'd have to ask the question whether that scheme is designed to do that. Now, if it crossed all those thresholds, then I think, yes, I would defend that as well, but I do think that it presents different and more difficult questions. But I would like to see whether there is the requisite germaneness in that. Kennedy, as Ginsburg expressed, about the difficulty of simply creating structures in foreign countries. If — and I've looked through all of your cases. What's your closest case, your best case, for the fact that you should get extra deference because this is the foreign affairs field? I mean, I think of U.S. v. Curtis Wright. Anything more specific than that? I don't know that I have a particular case other than the doctrine generally, Justice Kennedy. But I do think that the foreign location of this is significant vis-a-vis the concern that I think many of you have raised about why have an affirmative condition that requires espousal of a policy. Precisely because the conduct here is carried out in foreign areas and precisely because it can involve myriad interactions with local officials and local policymakers, as Respondents admittedly want to do on these sensitive questions, it makes sense in this context, particular sense in this context, to secure an ex-ante commitment of agreement with the government's policy, because that will have a self-policing aspect to it. It will be more designed to secure conduct in those areas that, in conformity with Federal policy, in a realm in which that conduct is particularly difficult to monitor. I'd like to reserve the balance of my time for rebuttal, if I might. Thank you, counsel. Mr. Broker. Mr. Chief Justice, and may it please the Court. Respondents do not dispute that the Spending Clause gives the government significant authority to fund the programs of its choosing and to control speech and conduct within those programs. The problem with the policy requirement is that it aims at grantees, requiring that they profess a personal belief and refrain from certain private speech outside the context of the government program. In Ross v. Sullivan, the Court held that the government could ban abortion-related speech in the government's own family planning program, but the grantees there were left unfettered in their personal beliefs and in their private speech outside the program. I don't see why this is a you talk about banning their speech. The government is just picking out who is an appropriate partner to assist in this project. It wants to go and find people who, like them, are opposed to prostitution. And all they want to do is make sure that you're opposed to prostitution. It's like any other sort of condition. You know, we want to make sure that you haven't been convicted of tax fraud over the last 10 years. So sign a certification that you haven't. Yes, it's related to speech, but the whole program is about that. Why would they want to sign up with somebody who didn't share the objectives of the program? Well, I think the policy requirement here has been applied a little differently than Mr. Chief Justice suggests. It is applied in a way that is a funding condition, not part of the selection criteria. When the government goes out to select its partners in this case, it goes out with requests for applications, and those requests for applications pertain to the particular program at issue. And they are very detailed about what precisely is required for that program. So it would be a different case, in your view, as if when they have those criteria, they have one of them as, oh, by the way, you must agree with the objective of the program, which is to eliminate to the extent possible prostitution and sex trafficking. No, I don't think that's right. I think the government absolutely can pick partners who are dedicated to the particular program for which they are applying, but there are constitutionally permissible ways to do that. One of the ways to do that is to look at technical capacity, past performance, references. What have you done before that shows you're able to do this? Scalia. Well, it isn't just able to do. Are you saying that they just can't make it a prior condition, but they can select applicants on the basis of which ones they know agree with the government's objectives? You have two equally qualified, technically, two equally qualified applicants, and the government intentionally picks the one whose views on prostitution are similar to the government's. Is that bad? Yes. And the reason it's bad is because the government there is focused on viewpoint and not on ability to perform the program. The problem was focusing on the viewpoint. Kennedy, you are a constitutional expert, and you take your oath to uphold the Constitution very seriously. A funding bill comes before you. You are the chairman of the committee. And you decide that you're going to fund A rather than B because you like their speech much better. Is that a violation of the Constitution? Because you like their policies much better. The Congress can certainly fund a particular program and not fund others. And we have no argument with that. The spending condition, the spending clause definitely comes with that ancillary power. And, in fact, that's what the Congress did here. It said we want to fund a fight against HIV-AIDS. We don't want to support that disease. And we want to oppose prostitution. We don't want to support that practice. What it cannot do, then, is take its viewpoint and impose its viewpoint on the grantee. And make it a condition. Kennedy, I'm not quite sure I see the difference. A conscientious Congressperson cannot, can, in your view, say I'm going to prefer Organization A over Organization B because I like their policies better? Well, I don't. Across the board, with reference to drugs, with reference to guns, with reference to public health. If Congress is looking at the viewpoint of an organization and deciding whether to fund it based on its viewpoint, I think that's problematic. The reason I think it's problematic is because this Court has said to deny a subsidy or a benefit on the basis of the exercise of one's First Amendment rights, including holding one's own views, to deny a subsidy on that ground is problematic. You can't fund the Boy Scouts of America because they like the programs that the BSA has? They have to treat them equivalently with a Muslim brotherhood? Is that really what you're suggesting? Not at all. I think. Well, then you can take into account the principles and the policies of the organization that you're giving funding to. Well, this Court has never said that the Congress can make a decision based on viewpoint policy. But there's no way to separate it. With an organization in the field that does things, there's no way, I don't think, to separate what they do from what they say. Congress has two opposite views on this in front of it. One is the view that the way to fight AIDS is consistent with and is furthered by longer-term efforts to abolish trafficking in women. Okay? Prostitution. All right? The other view is the better way to do it is to go into the active sex worker area and not express views on the merits of what they're doing. Okay? So they have two opposite views. And moreover, the groups that do this act on those views. So why can't they say we prefer view A or B, whichever it is? And because that's what our program is about. Congress can certainly decide what programs to fund and what programs not to fund. But when Congress makes that decision, Congress then can't take the next step to say the only people who can get funds under this particular program are people who agree with us and who will refrain from saying anything inconsistent in their package. Scalia. You go further than that. In answer to my question, you go further than that and you say, moreover, even without making it a condition preceding to getting the money, Congress can — the government cannot intentionally select those people that it thinks are in accord with its views. Right? Isn't that what you said? The Court has never said that's okay. And it's our — I'm not asking what the Court said. I'm asking what you're saying. It's our position that it is constitutionally problematic to make funding decisions based on the viewpoint of grantees. Problematic or unconstitutional? Unconstitutional as applied here. However, however, we're not saying that there's no circumstance in which the government's interest wouldn't be compelling enough to override the First Amendment right. Now, in our situation— Roberts, so let's just say the government wants to have an ad campaign to discourage people from smoking, and they're looking for ad agencies to help them with it. And an ad agency comes in and says, look, we are the best ad agency there is. We know exactly how to get to the markets. We know what's persuasive and all that. And yet — and then the ad agency says, you know, come work at our agency if you smoke. We think smoking is okay. We have smoking breaks. We do all this. The government can't take that into account? I think the rules are different when the government hires a spokesperson. When the government hires a spokesperson, the government has the right, under the — under its ancillary power under the Spending Clause, to control what that spokesperson says for the government. Well, isn't that part of what's going on here? One of the things we want to do is eradicate prostitution and sex trafficking, and we want you to get that message out. And the one thing we're sure of is if you're not — if you're in favor or you're not opposed to it because you have other objectives, you're not going to help get the message out at all. Well, the government does say that. The government says what we need to prevent is the situation where the government spokesperson says one thing with public funds, turns right around and says the opposite with private funds. And what we say is this is an as-applied challenge. We have — it's — the government concedes. My clients have not been enlisted as government spokespersons, and they are not responsible for conveying any viewpoint or any message. And I'd like to talk for a moment about what my clients really do. In the field, my clients provide services in the fight against HIV-AIDS, things such as preventing mother-to-child transmission of HIV in Tanzania, caring for orphans of AIDS victims in Kenya, and providing HIV-AIDS support services in places like Vietnam. And this is at JA88 and 89, where you can see the list of things that my clients do. None of those things relate to an opposition to prostitution, and none of those things relates to messaging. Sotomayor, that's my problem, which is I'm trying to tease out what your position is, okay? I have an understanding of your saying, you can't compel me to say I don't like something, and that's like an oath of loyalty. That's understandable. But if the government said the following more clearly — this is an oddly phrased policy, okay, because it seems to be requiring this oath — but if it simply said, if you're an organization that wants our funds, you have to say that you're not going to promote actively the contrary policy. Would that be okay? You're not going to go out there and do things to promote the legalization of prostitution because that's going to undermine our message. Those are two different positions, so tell me where you draw the line. Certainly, that would be okay within the four corners of the government program. The government controls speech and conduct within its program. It can tell us what not to say within the program, and that's Rust. And that's Rust. And that's Rust. And this is a step further. And what Rust says, and I think we fall back on Rust, which we think is just on all fours with where we are here, and that is what the government cannot do, and I think this answers your question, is outside the government program, the government cannot control private speech. And it was critical in that case. Justice Rehnquist at pages 196 and 197 said the doctors there and the public health organizations there are free to engage in their own private speech and their own activities, and they're not required to endorse any viewpoint they don't, in fact, hold. And here the— Roberts. But that is saying this is what's happening in Rust, okay, and Rust is okay. That's very different from saying it has to be that way, and if it's any other way, it's no good. It seems to me that you're just taking the limitation on the facts in Rust and saying that is an absolute requirement, which is a misreading of the case. Rust does not say that, to be clear. But the reasoning of Rust, and the majority's reasoning there, makes quite clear that the reason the Court was comfortable there is that the recipient was not the target of the control. The control was around the program. And the recipient was free outside the program. And Respondents here have respected that line. There's no question that for the past 10 years, even though the policy requirement has not been enforced, initially because the Department of Justice concluded that it is unconstitutional, and then subsequently because the district court enjoined it, it has not been enforced for the last decade, essentially. And there's no evidence of harm at all here. So there's none of this undercutting the program that the Government is alleging here.  Sotomayor-Girourds, Jr. No, no, no. I cut you off. But I guess what I'm – I keep going back – you keep going back and forth on this – it's not okay to tell me to take an oath of loyalty. But would it be okay for you to step outside the doors of this program and pass out the literature that promotes the legalization of prostitution? Am I making my question clear? Yes. Which is, how do you – how do you answer the question of why does the Constitution bar the Government from saying, look, if you're going to work with me, you can't go out there and promote a – actively promote a different message? That's not the case here, but taking that case, taking that case, I think the Government can't do that. I think the Government cannot gag an organization's private speech outside the program. Now, even the Government says there has to be some germaneness between what they are doing in the program and what our requirement is. So I do think it would be a tougher case for us and a stronger case for the Government if my clients were engaged in a program that opposed prostitution. We're not, but if we were, and then we went right outside and said the opposite with our private funds, I think they would have an easier time showing that there is some compelling interest that overrides the First Amendment interest. Now, I think it would depend on the facts, and those are not the facts here. Breyer. See, it's not – it's not, in my opinion, not a viewpoint matter if they are going to fund a group that wants to end discrimination against women around the world because they think all kinds of good things will flow from that. The Government wants to fund it. Of course such a group has a viewpoint. That's why they are in the business. So the word isn't viewpoint. And you started to say something about that there is more than that here. It has to do with the express nature. And then in answering Justice Sotomayor, you went a little bit further on that. And what are the form of words, if you were me and if I were to decide on your favor, what form of words would you dictate to describe where it is in your opinion that the First Amendment cuts in with a preventative restriction? How do you describe it? I don't think you can in terms of viewpoint. I don't think you can in terms of viewpoint either, Justice Breyer. I do think that the key, the key that this Court outlined in Rust is the Government's authority to control its program. And if there is a threat to its program and the Government needs to take some action in order to protect its program, prevent the message from being garbled or distorted, whatever the language is, then the Government's case is strongest. Here, that is not at all what is happening. As I described, our programs are not opposition to prostitution programs. Our programs are HIV testing. These are mother-to-child transmission situations where we are trying to stop the disease from spreading. Scalia. Can I be sure I understand what you just conceded in your response to Justice Breyer? The Government could require as a condition to come into this program and become a partner with the United States that the recipient not have the viewpoint of favoring prostitution. No. Well, you said it's not a viewpoint thing. No. The Government cannot target viewpoint. And for us, that's a bright-line rule. I thought that's what you just said to Justice Breyer. Well, I did, too, because I didn't see the reason I thought that was. I can think of dozens and dozens of programs all over the world that the Government supports in some way or other. And of course the people in those programs have a certain viewpoint and, of course, they don't hold the opposite viewpoint. Otherwise, they wouldn't be in the program. So that's why I didn't find that useful. But now, I don't think you can have it both ways between answering these two questions. What is the answer? Give it to me. You have to choose. Mr. Chief Justice, I need your help. You can always choose me, too. Well, our position here is that viewpoint is not the basis on which a decision can be made. That is our position. We think the Government has a multitude of permissible grounds on which to make these types of decisions. And they do it every day in every other program where they don't have this odd policy requirement. They do it every day. Your approach, it seems to me, is just dealing with the breadth of the program. If the program here solely concerned prostitution and sex trafficking and not other areas where you say, look, we do a great job in these other areas, we just don't get involved in that area. But if the sole program was on prostitution and sex trafficking, you wouldn't have a leg to stand on, would you? We absolutely would have a leg to stand on. And let me just explain what I attempted to concede before. And that is, if the Government, in that narrow case where the Government is hiring a spokesperson, which is what they've focused on, saying one thing with public funds and turning right around and saying another with private funds, there's no case that says they can gag the private speech of that spokesperson. But what we're saying is it is certainly possible that they would have a stronger case in that particular circumstance. However, this is an as-applied challenge. My clients are not spokespersons. They concede that. My clients are not delivering a message or any particular viewpoint on behalf of the Government. They concede that. Kennedy, Let me just ask this one more time. Because it seems to me that when you get into the details of your answer, you indicate, oh, well, the Government has lots of other criteria it could use, which seems to me just an invitation to disguise what the Government's real motive is. Suppose the Government is interested in preventing and stopping the spread of malaria, and there's an organization that's marvelous at delivering the proper message for this, but they criticize the United States often. So they choose an organization that's not quite as good, but that's quiet on these other issues. Is that permissible for the Congress to do? No, I don't think it is. To the extent the criteria used by the Congress are merely pretexts to do that, I don't think it is. Kennedy, no, my concern was that your position was pretext. Here's the Congress's right up front. And says this is the reason. And they say the reason we're not giving to Organization A is because it's always critical to the United States, even though its technical skills are better. We prefer Organization B. Congress cannot do that? Congress cannot do that. And your best case for that proposition is what? Well, even the Government concedes that they can't do that. What they say is in a – it must be germane. That's their limiting principle. I'm not sure they should, if they're going to be able to establish the principle that allows them to prevail in this case, and that's why I'm asking. I don't think that that's permissible, because all that is, is penalizing a particular viewpoint and withholding a subsidy or benefit based on viewpoint. I just want to make sure I'm confused. The Government has a program to develop water resources. And let's say it's in South Africa before the abolition of apartheid. And there's a pro-apartheid group and an anti-apartheid group, and you're saying the Government can only decide which one is better at digging wells, and it can't say we're going to prefer the anti-apartheid group. Well, that – I don't think it can make that decision based on viewpoint. However – Viewpoint on apartheid. It can't say, so the other one shows we've got a better record, we dig the wells quicker. I mean, the reason that case is so much tougher than this one is because in this one, they're not attempting to select organizations that will do the best job by using the policy requirement. The policy requirement is being used after the organization has been selected to say, now that you've been selected, we want you to toe the line. We want you to profess your belief in our viewpoint and not to say anything with your private funds outside the program. So it is so far beyond this – this weighing in a selection situation. It goes to the effectiveness of the program. It's related to it. The United States doesn't want the company or the organization that goes into a village and says, we're going to bring – you know, this is from the United States. We're bringing you fresh water. And it's a pro-apartheid group. That does undermine what they're trying to do. Just as in this case, to have the organization providing the services that your organization provides be identified as an organization that doesn't want to abolish prostitution. Yeah, I understand. I think the government could, if it could make the case that an organization will be unable to do this effectively because of what it has said in the past or what it has done in the past or how the population associates – what the population associates with that organization. But here – here, and the government even concedes, there has to be some – I think the word was it has to be tightly tethered to the programmatic objective. Now, we think that's – that's way too easy to fulfill. That should not be the standard. But that's what they say the limiting principle is, is germaneness tightly tethered. In – in your example, I think that probably doesn't even meet their limiting principle. But in our case – in our case, there is no tethering at all. We are out testing for the disease by extracting blood and running tests. We're out caring for orphans. We are out improving public health services that NGOs deliver. And they're saying now you have to profess your belief in our particular viewpoint. Scalia. Does it say profess belief? I was going to ask you about that. That's not what the statute says. It just says they have to have a policy. Policy, which means I suppose they have to tell their employees don't do anything to foster prostitution. But they don't have to get up and announce publicly we oppose prostitution, do they? Well, as it's been applied to us, it's more than just have a policy. It's have a policy and then tell us you agree with our policy. And we want to make sure that you believe it so we know that you will do a good job in the program. So the purpose here is to police belief. They can get all that without making you profess it. Well, we're not going to do that. Unless you consider the only profession to be the assurance to the United to your partner, the United States government, that you in fact oppose prostitution. Well, that's precisely it, Justice Scalia, is we are required to profess our belief to the government. That's the only profession you're talking about. That's the profession that we're required to. That's the pledge, as the author of the provision called it, was the pledge. That's the pledge to the government. And they're doing that, they say, because we're part of a belief as a matter of policy that the best way to go about this, whether you think so or not, is to restrict the grants to those people who will oppose the long-term extension of prostitution expressly. Now, that's their view of how to get rid of AIDS, you say. You might disagree with it, but there are plenty of people who think the opposite. So they're saying we're not doing it for any reason other than to further our policy. The government, no doubt, has a good reason for putting it there. The problem is the First Amendment. And where does that end? What is the limiting principle? If all that's required here is germaneness, and then you give a dollar and you own the viewpoint and you own the private speech, where does that end? What that means is, on the government's theory, the government can give you, can give anyone in the country a dollar in Medicare funds in saying, okay, now that you've taken a dollar of our money, we want you to profess your agreement with the Affordable Care Act, and we want you to never say anything inconsistent with that in your private speech. That is, that is wildly inconsistent with the First Amendment. That's exactly what's happening here. The only difference is the subject of prostitution. That's what makes it less palatable. But for us, if you can't do that, you can't do that, you can't do that, you can't  But it can't then say, and the organization outside the program is also bound by this profession. Within the program, they can tell us, if we're speaking for them, what to say, and on their behalf, not ours, and they can tell us what not to say, which is rust. They cannot command fealty to their viewpoint, and they certainly cannot control our private speech outside the program. Now, to be clear, I just want to address one last thing before my time runs. To be clear, Respondents here do not promote prostitution, nor do they approve of it. They merely want to be free in their own private programs to operate those programs as they see fit, consistent with public health objectives. And they want to be able to participate in the policy conferences. They want to be able to publish papers. And they want to be able to be a part of the discussion in the marketplace of ideas right here in the United States, not in the nether reaches of the world. Right here in the United States, they would like to be free to engage in this important discussion and to be unfettered by a policy requirement that demands fealty to the government's viewpoint. Now, the First Amendment gives Respondents that right, and that's why we're here. So unless the Court has further questions. Roberts. Thank you, counsel. Mr. Srinivasan, you have four minutes remaining. Thank you, Mr. Chief Justice. Just a few points in rebuttal. First, by way of characterizing this requirement, I think there's been a suggestion made that what we're trying to do is impose a viewpoint on organizations. This is not a matter of imposing a viewpoint on somebody. It's a matter of picking organizations with which to work who self-identify as having views that are commensurate with the government's views so that they will be reliable in carrying out the government's program. Now, Justice Kennedy, you'd asked about why, whether the point of contact in this case matters. I don't see the difference between those two things that you just tried to distinguish. Because it goes to the limitation that the Court has imposed in its decision about leveraging funding so as to suppress viewpoints. That's not what's going on here. This is not a case in which funding is being leveraged to suppress a viewpoint. It's a case in which we're trying to get an ex ante determination of whether the organizations that are going to carry out a Federal program agree with our policies. If they do, they can suppress a viewpoint. Alito, especially if you have an organization that previously has expressed support for the legalization of prostitution. But then when you tell them, well, if that's your policy, you can't get our money, they say, well, we need your money, so we're going to have to say, uncle, and now we're opposed to the legalization of prostitution. You're not then – that isn't trying to change people's viewpoint? I don't think it's trying to change the viewpoint that they are expressing. It's not – Justice Alito, with all respect, I don't think it's trying to change their viewpoint. I think if they decide later on that they affirm to us that they agree with the policy at that point in time, well, we may take that observation and engage them. But I don't think the effort is to try to change their viewpoint. It's to try to get them to self-identify that they're going to be reliable in carrying out the government program. Justice Kennedy, you'd asked the question about whether the foreign context matters, and I talked about why it matters in the sense that monitoring can be challenging in this context. It also matters in another sense that I should add, which is that when the organizations are doing this work in those areas, they are identified as working with the United States Government. There is a statutory provision at 291A of the Petition Appendix, which is 22 U.S.C. 7611H, and that requires the Global AIDS Coordinator to develop a message that enhances awareness by program recipients that the program is an effort on behalf of the citizens of the United States. So there is a real perception out there that when the organization is carrying out these functions, it's doing so at the behest of the United States citizens. And part of what Congress wanted to do was to avoid a misimpression about what the United States' policy priorities are. And one way to do that is to assure that the organizations with which the United States works share the United States policy commitment against prostitution and sex trafficking. Sotomayor, I would have less problem accepting your message if there weren't four major organizations who were exempted from the policy requirement and medical science, and the United States vaccinators are exempted. There seems to be a bit of selection on the part of the government in terms of who it wants to work with. It would seem to me that if you really wanted to protect the U.S., you wouldn't exempt anybody from this. Justice Sotomayor, Congress is not required to pursue every objective, no matter what the cost may be. The Court confronted a similar situation in Regan. That case involved an exemption for veterans. The Court applied a rationality standard and said that was fine. And there's certainly a rationality here. Ginsburg-Ginsburg, that was one veteran. Everybody else was subject to the lobbying restriction. Here, it's 20 percent of the funds go to the organizations that are free from this plague. Justice Ginsburg, I think the exemption for these organizations makes good sense if you consider the character of the organizations. Three of the four are — have members that are sovereign entities. And so one can understand — can I just finish this thought? One can understand why Congress would have wanted to tread with sensitivity when we're dealing with foreign countries, especially foreign countries that have different views about prostitution. And there's less of a danger — and this is the final point — there's less of a danger in that context that those entities' views are going to be misattributed to the United States precisely because they're our foreign countries. Roberts. Thank you, counsel. Counsel. The case is submitted.